Present:  All the Justices

CHRISTOPHER C. GOINS

v.  Record Nos. 951869, 951870

OPINION BY JUSTICE BARBARA MILANO KEENAN
April 19, 1996

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Thomas N. Nance, Judge

In this appeal, we review the capital murder conviction and the death sentence imposed on Christopher C. Goins, along with his convictions for first degree murder, malicious wounding, and use of a firearm in the commission of murder and malicious wounding.

## I. Proceedings

Goins was indicted for capital murder for the killing of Robert Jones, based on the willful, deliberate, and premeditated killing of more than one person as part of the same act or transaction.  Code § 18.2-31(7).  He was also indicted on four charges of first degree murder for the killing of Daphne Jones, Nicole Jones, David Jones, and James Nathaniel Randolph, Jr. Code § 18.2-32.  Finally, Goins was indicted for the malicious wounding of Tamika Jones and Kenya Jones, and for seven charges of use of a firearm during the commission of each of these felonies.  Code §§ 18.2-51 and -53.1.

In the first stage of a bifurcated jury trial conducted pursuant to Code § 19.2-264.3, the jury convicted Goins of all offenses charged in the indictments.  The jury fixed his punishment at four terms of life imprisonment for the first degree murder convictions, two terms of twenty years'

imprisonment for the malicious wounding convictions, and six terms of five years' imprisonment, as well as one term of three years' imprisonment, for the convictions of use of a firearm in the commission of a felony.

At the penalty phase of the capital murder trial, the jury heard evidence in aggravation and mitigation of the offense and fixed Goins' punishment for capital murder at death, based on findings of both "future dangerousness" and "vileness." After considering the probation officer's report and conducting a sentencing hearing, the trial court sentenced Goins in accordance with the jury verdicts. Under Code § 17-116.06, we have certified Goins' appeals of his non-capital convictions from the Court of Appeals, which we have consolidated with his appeal of the capital murder conviction and our review of the death sentence.

## II.  The Evidence

We review the evidence in the light most favorable to the Commonwealth, the prevailing party below. Cheng v. Commonwealth, 240 Va. 26, 42, 393 S.E.2d 599, 608 (1990). On the morning of October 14, 1994, Goins and his friend Barry Scott arrived at the home of Tamika Jones, where Tamika and the six other members of her family were present. Both Goins and Scott were friends of the Jones family.

Tamika, who was 14 years old, was seven months pregnant with Goins' child and recently had returned from the hospital after

receiving treatment for complications related to the pregnancy. When Scott attempted to show Goins an ultrasound photograph of the fetus, Goins refused to look and became angry.

Tamika saw Goins in the living room, but was in her bedroom when she later heard him participating in a conversation in the kitchen. The conversation was interrupted by the sound of gunfire. The shots were fired rapidly and were followed by screams, crying, and the sound of a single set of footsteps in the hall. Tamika stated that she then heard more shots and saw "flashes in the hall."

Goins appeared in the doorway of Tamika's bedroom and shot her nine times. He also shot her 21-month-old sister, Kenya, whom Tamika had attempted to shield with her body.

When Tamika believed that Goins had left the apartment, she telephoned "911" for emergency assistance. She told the operator that Goins had shot her. The operator asked if anyone was with her. Tamika responded, "Yes. He shot them too."

When the City of Richmond police arrived at the Jones' home, they determined that all the members of the Jones family had been shot. Only Tamika and Kenya survived. In the kitchen, the police found the body of Tamika's four-year-old brother, David, as well as the bodies of her parents, Daphne Jones and James Randolph, Jr. In one of the bedrooms, the police found the bodies of Nicole Jones, Tamika's nine-year-old sister, and Robert Jones, Tamika's three-year-old brother.

Daphne Jones was shot four times, twice in the head, once in the left wrist, and once in the right leg.  Both of the gunshot wounds to her head were lethal.  One of these wounds showed evidence of "stippling," consisting of burned and unburned gun powder, which indicated that the gun was fired within a few feet of her head.

James Randolph, Jr. was shot nine times, twice in the head, three times in the left arm and chest, once in the abdomen, once in the right arm, once in the left leg, and once on the chin. Four of these wounds were lethal.  The evidence showed that some of the shots were fired from less than "arm's length" and other shots were fired after Randolph had fallen to the ground.

David died as a result of a lethal gunshot wound to the head.  This wound also showed evidence of stippling.  Nicole suffered two lethal gunshot wounds.  One bullet passed through her heart and a lung.  The other bullet was fired into her head at close range.  Robert sustained two lethal gunshot wounds to his head.  Kenya sustained a wound, measuring between two and three inches long, through her left wrist.

Tamika was shot three times in the abdomen, three times in her thighs, once in her right hand, once in the neck, and once in her left shoulder.  Her obstetrician performed a hysterectomy on her after the shootings, because multiple bullets had perforated her uterus and her right ovary and fallopian tube.  When removed from the uterus, the fetus had sustained a gunshot wound to its

- 4 -

face and was dead.

The police retrieved from the kitchen seven .45 caliber cartridge casings, various bullets, and bullet jacket fragments. In the bedroom where Nicole and Robert were shot, the police found two .45 caliber cartridge casings, as well as two bullets, a bullet jacket, and a lead fragment. In the bedroom where Tamika and Kenya had been shot, the police recovered six .45 caliber cartridge casings and two bullets. No weapon was found.

James L. Pickelman, a firearms identification expert at the Commonwealth's Division of Forensic Science, explained that hollow point bullets, such as those used in the commission of these offenses, are designed by the manufacturer to explode on impact with the target. Frequently, at the point of impact, the bullet core separates from its jacket. Pickelman examined the weight and rifling characteristics of the bullets, bullet jackets, and jacket fragments recovered from the apartment and the victims' bodies. He testified that all these items were ".45 auto caliber."

After examining the rifling marks on the bullet jackets and jacket fragments retrieved from Jones' apartment, Pickelman concluded that the bullet jackets were ejected from a firearm constructed by a manufacturer who uses polygonal rifling. Pickelman also stated that Glock, Inc. is the major manufacturer which uses this type rifling in the design of its firearms.

Ann D. Jones, also an expert in firearms identification at

the Division of Forensic Science, compared the various microscopic markings on each cartridge casing that was recovered. Her examination of these markings established that all the cartridge casings were fired from the same .45 caliber Glock pistol. Jones stated that .45 caliber Glock pistols produce an elliptical shape firing pin impression, which is unique to that brand and type of pistol. She observed this impression on all the cartridge casings recovered from the crime scene.

Jones also testified that she compared the markings on one of the cartridge casings found at the crime scene with the markings on the unfired .45 caliber cartridge found in the home of Monique Littlejohn, Goins' girlfriend. Jones observed that these items exhibited the same extractor marks and concluded that both items had been in the same weapon.

On two occasions, the police searched Littlejohn's apartment. In addition to the unfired .45 caliber cartridge, they found an instruction manual for Glock pistols lying on the floor near some men's clothing.

In Littlejohn's automobile, the police found a Sam's Club identification card. Although Goins' photograph appeared on the card, the card was issued in the name of Derrick Reardon. Two other identification cards were also found in Littlejohn's car. Both cards were issued in the name of Derrick Reardon, but displayed Goins' picture. Investigators also found a high school equivalency diploma issued in the name of Derrick Lydell Reardon

in Littlejohn's vehicle, as well as the business card of a taxicab driver, Parrish Davis.

Approximately one month after the shootings, Goins was apprehended in New York with Monique Littlejohn. At the time of his arrest, Goins had shaved his head.

Parrish Davis, who had known Goins for several months prior to the shootings, testified that Goins had been a passenger in his taxicab approximately once or twice each week during those months. Davis stated that, during this time, Goins was living with Littlejohn at her apartment.

Davis also stated that about one week before the shootings, he had a conversation with Goins, in which Goins stated that he was upset because Tamika was pregnant by him. Goins told Davis that "he wanted to do away with her and her family." At that time, Davis did not believe that Goins intended to harm the Jones family. However, Davis stated that he and Goins occasionally discussed the subject of .45 caliber pistols.

Davis also testified that he spoke with Goins on the evening of October 14, 1994, after the shootings. During that conversation, Goins asked Davis to drive him out of town in the trunk of a friend's car. Davis refused to do so.

After the Commonwealth rested its case, Goins presented testimony from two witnesses. Mildred S. Plumber, an employee of the taxicab company for which Davis worked, testified that company records for October 1994 indicated Davis had reported no

fares for service to or from the address at which Littlejohn and Goins lived.  However, Plumber conceded that Davis might have provided service to that location and not have reported the fares to the company.

Goins also offered the testimony of Jason Lamont Williams, who stated that, during the week before the killings, he "might have" ridden with Goins in a taxicab driven by Davis.  Williams stated that Goins never said anything in his presence about guns or about "doing away" with Tamika Jones or her family.

On cross-examination, the Commonwealth's attorney asked Williams, "Do you or have you in the past sold drugs for Mr. Goins?"  The trial court sustained Goins' objection to the question.  The Commonwealth's attorney then asked, "Sir, have you ever told your probation officer, Ms. Bircham, that you sold drugs for this defendant?"  Once again, the trial court sustained Goins' objection to the question.  Finally, the trial court permitted the Commonwealth's attorney to ask Williams, "Did you ever tell your probation officer, Ms. Bircham, that you had a business relationship with Mr. Goins?"  Williams responded, "No."

During the penalty phase of the trial, the Commonwealth offered testimony from Detective John J. Riani of the Henrico County Police Department, who testified that, in February 1994, he had encountered Goins while working as a narcotics investigator at the Amtrack station on Staples Mill Road.  Goins had alighted from a train arriving from New York when Riani

approached and asked him some questions. When Goins later consented to a search of his bags and clothing, Riani found 55.35 grams of crack cocaine in a bag inside Goins' coat pocket. This amount of cocaine had a "street value" of approximately $5,500.

Riani then arrested Goins for possession of cocaine with intent to distribute. Goins told Riani that he was addicted to crack cocaine.

Goins never appeared for trial and a capias was issued for his arrest. Both the cocaine charge and the capias remained outstanding at the time of the present offenses.

The Commonwealth also presented evidence from Dr. Jack Daniel, Assistant Chief Medical Examiner for the Commonwealth. Dr. Daniel testified that James Randolph, Jr., Nicole Jones, and Robert Jones all suffered multiple lethal gunshot wounds. He also testified that one of Nicole's lethal wounds occurred while she was lying face down. In addition, Dr. Daniel stated that the dried blood on Robert's face indicated that Robert had not moved after he was shot the first time.

In mitigation of the offenses, Goins presented the testimony of Paulette Goins Dickerson, his mother's sister. Dickerson testified that Goins' mother had used drugs frequently in front of Goins. Dickerson also testified that Goins has an aunt who abuses drugs, and that another of his aunts died of AIDS acquired from drug use. Dickerson further related that Goins has an uncle who is incarcerated in New York. Another uncle is mentally

handicapped, as a result of a head injury sustained at age two when Goins' mother pushed him out of a third-story window.

Dickerson also testified that, when Goins was 12 years old, he moved from Richmond to New York to live with his grandmother because his mother had abused him. Dickerson stated that Goins' mother never held, hugged, or nurtured any of her children. According to Dickerson, Goins was devastated when his grandmother died, because she was the only person who had shown him any love.

Goins' cousin, Leah Butler, testified that she had lived briefly in the same household with Goins and had observed his mother use drugs and neglect her children. Butler also testified that Goins is a caring, "giving" man. Butler's son, Phillip, age six, testified that he liked Goins, and that Goins would often play games with him and bring him candy.

### III. Issues Previously Decided

Goins has advanced a number of arguments that we have rejected in previous decisions. Finding no reason to modify our previously expressed views, we will reaffirm our earlier decisions and reject the following contentions:

A. The death penalty statutes do not give meaningful guidance to jurors that they may impose a death sentence only if they determine beyond a reasonable doubt that aggravating circumstances outweigh mitigating ones. Rejected in Williams v. Commonwealth, 248 Va. 528, 535, 450 S.E.2d 365, 371 (1994), cert. denied, ___ U.S. ___, 115 S.Ct. 2616 (1995); Breard v.

Commonwealth, 248 Va. 68, 74, 445 S.E.2d 670, 674-75, <u>cert. denied</u>, ___ U.S. ___, 115 S.Ct. 442 (1994).

B.  The death penalty statutes fail to instruct the jury properly on its consideration of mitigating evidence.  Rejected in <u>Graham v. Commonwealth</u>, 250 Va. 79, 85, 459 S.E.2d 97, 100, <u>cert. denied</u>, ___ U.S. ___, 116 S.Ct. 535 (1995).

C.  The aggravating factors of "vileness" and "future dangerousness" are unconstitutionally vague.  Rejected in <u>Breard</u>, 248 Va. at 74, 445 S.E.2d at 675.

D.  Future dangerousness may not be proved by unadjudicated conduct unless the conduct is established beyond a reasonable doubt.  Rejected in <u>Williams</u>, 248 Va. at 536, 450 S.E.2d at 371.

E.  The death penalty as administered in Virginia constitutes cruel and unusual punishment and is imposed in an arbitrary and a discriminatory manner.  Rejected in <u>Chandler v. Commonwealth</u>, 249 Va. 270, 276, 455 S.E.2d 219, 223, <u>cert. denied</u>, ___ U.S. ___, 116 S.Ct. 233 (1995); <u>Smith v. Commonwealth</u>, 219 Va. 455, 476, 248 S.E.2d 135, 148 (1978), <u>cert. denied</u>, 441 U.S. 967 (1979).

F.  The death penalty statutes are unconstitutional because they allow, but do not require, the trial court to set aside the death sentence upon a showing of good cause and permit the court to consider hearsay in the post-sentence report.  Rejected in <u>Chandler</u>, 249 Va. at 276, 455 S.E.2d at 223.

G.  The appellate review procedures for death sentences in

Virginia, including the expedited review process, are unconstitutional.  Rejected in Smith v. Commonwealth, 239 Va. 243, 253, 389 S.E.2d 871, 876, cert. denied, 498 U.S. 881 (1990); Payne v. Commonwealth, 233 Va. 460, 473-74, 357 S.E.2d 500, 508-09, cert. denied, 484 U.S. 933 (1987).

H.  The denial of questions during voir dire, jury instructions, and other information about the fact that the defendant would be required to serve a minimum of 25 years before becoming eligible for parole.  Rejected in Joseph v. Commonwealth, 249 Va. 78, 84, 452 S.E.2d 862, 866, cert. denied, ___ U.S. ___, 116 S.Ct. 204 (1995).  Under the principles expressed in Joseph, the trial court also properly rejected Goins' request to introduce evidence of parole eligibility at the sentencing phase.

I.  The denial of an asserted right to exercise additional peremptory challenges.  Rejected in Beavers v. Commonwealth, 245 Va. 268, 273, 427 S.E.2d 411, 416, cert. denied, 510 U.S. ___, 114 S.Ct. 171 (1993).

J.  The denial of individual voir dire of potential jurors. Rejected in Chichester v. Commonwealth, 248 Va. 311, 319, 448 S.E.2d 638, 644 (1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1134 (1995).

K.  The denial of a request to mail a questionnaire to all potential jurors.  Rejected in Strickler v. Commonwealth, 241 Va. 482, 489-90, 404 S.E.2d 227, 232, cert. denied, 502 U.S. 944

(1991).

### IV.  Pretrial Matters

#### A.  Bill of Particulars

Goins filed a motion for a bill of particulars.  During a hearing on the motion, he conceded that the Commonwealth already had provided him all information required by Virginia law.  The trial court denied Goins' request for an additional statement of all evidence on which the Commonwealth intended to rely to prove the offense of capital murder and the death penalty predicates.

Goins argues that the trial court's denial of this request impeded his ability to make pretrial challenges to the application of the capital murder and death penalty statutes, and to file timely motions for suppression of the evidence on Fourth and Fifth Amendment grounds.  Goins also asserts that, under Godfrey v. Georgia, 446 U.S. 420 (1980), the Commonwealth was required to state in a bill of particulars its "narrowing constructions of the 'vileness' factor."  We disagree.

A defendant is not entitled to a bill of particulars as a matter of right.  Code § 19.2-230 provides that a trial court "may direct the filing of a bill of particulars."  Thus, the trial court's decision whether to require the Commonwealth to file a bill of particulars is a matter committed to its sound discretion.  Quesinberry v. Commonwealth, 241 Va. 364, 372, 402 S.E.2d 218, 223, cert. denied, 502 U.S. 834 (1991).

A bill of particulars is not required if the indictment

provides a defendant sufficient "notice of the nature and character of the offense charged so he can make his defense." Wilder v. Commonwealth, 217 Va. 145, 147, 225 S.E.2d 411, 413 (1976). We conclude that the capital murder indictment, the only indictment challenged in this assignment of error, met that standard.[1]

In addition, contrary to Goins' assertion, Godfrey does not require the Commonwealth to state in a bill of particulars its construction of the "vileness" predicate or its evidence supporting a finding under that predicate. Godfrey addresses the issue of what instructions must be given to a jury considering the "vileness" predicate, in order to prevent "[t]he standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury." 446 U.S. at 429. Godfrey mandates that the jury and reviewing court be provided a "principled way to distinguish this case . . . from the many cases" in which the death penalty is not imposed. Id. at 433. Thus, Godfrey is inapposite to the present issue, which involves

_____

[1]The capital murder indictment alleged that "[o]n or about October 14, 1994, in the City of Richmond, Christopher Cornelius Goins did feloniously and unlawfully commit capital murder in that he did kill and murder Robert Jones in a willful, deliberate and premeditated killing of more than one person as part of the same act or transaction."

only Goins' motion for a bill of particulars.

In addition, the record fails to show that the denial of Goins' request for a bill of particulars impaired his ability to challenge the application of the capital murder and death penalty statutes, or to file suppression motions based on Fourth and Fifth Amendment grounds. Therefore, we conclude that the trial court did not abuse its discretion in denying the motion for a bill of particulars.

B. Discovery

Next, Goins contends that the trial court erred in denying his motion for discovery of the results of a polygraph test administered to Barry Scott. Goins argues that the Commonwealth was required to produce the polygraph test results because they may have contained exculpatory evidence and impeachment material.

Goins also contends that the trial court erred in denying his motion for production of all documents, diagrams, and sketches relating to the case that were shown to any of the Commonwealth's potential witnesses. Goins acknowledges that this request exceeded the requirements of Rule 3A:11. Nevertheless, he argues that, based on the number and nature of the charges against him, the trial court was required to order discovery of all exculpatory evidence and all other evidence that the Commonwealth intended to offer to establish his guilt. Goins asserts that the denial of these discovery requests violated his rights under the due process, compulsory process, and

confrontation clauses of the United States Constitution.[2]  We disagree.

The Commonwealth is required to provide a defendant exculpatory evidence, including evidence which impeaches the credibility of a prosecution witness.  Brady v. Maryland, 373 U.S. 83, 87 (1963); Robinson v. Commonwealth, 231 Va. 142, 150, 341 S.E.2d 159, 164 (1986).  However, a defendant does not have a general constitutional right to discovery in a criminal case. Lowe v. Commonwealth, 218 Va. 670, 679, 239 S.E.2d 112, 118 (1977), cert. denied, 435 U.S. 930 (1978) (citing Weatherford v. Bursey, 429 U.S. 545, 559 (1977)).

In order for a defendant to establish a Brady violation, he must demonstrate that the undisclosed evidence was exculpatory and material either to the issue of guilt or to the issue of punishment.  Lowe, 218 Va. at 679, 239 S.E.2d at 118.  The mere possibility that "undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."  United

---

[2]Goins also argues that the denial of the discovery motions impeded his right to the effective assistance of counsel.  This claim, however, is not reviewable on direct appeal.  Walker v. Mitchell, 224 Va. 568, 570-71, 299 S.E.2d 698, 699 (1983); Browning v. Commonwealth, 19 Va. App. 295, 297 n.2, 452 S.E.2d 360, 362 n.2 (1994); see Acts 1990, ch.74.

States v. Agurs, 427 U.S. 97, 109-110 (1976).

The present record does not show that the Commonwealth withheld exculpatory information. In fact, the Commonwealth's attorney stated that he would disclose any prior statements of witnesses that were inconsistent with their anticipated trial testimony. Thus, since the record fails to show that the Commonwealth withheld from Goins exculpatory evidence, and since Goins concedes that the Commonwealth provided all other discovery required under Rule 3A:11, we conclude that the trial court did not violate Goins' right of due process in its discovery ruling.

We also hold that the trial court did not violate Goins' rights under the confrontation and compulsory process clauses of the Sixth Amendment. A defendant's rights under the confrontation clause are trial rights which are designed to prevent the improper restriction of cross-examination. These rights "[do] not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." Pennsylvania v. Ritchie, 480 U.S. 39, 53 (1987). These rights are "satisfied if defense counsel receives wide latitude at trial to question witnesses." Id. Thus, Goins' rights of confrontation were not denied by the trial court's discovery ruling.

The compulsory process clause provides a defendant with government assistance in compelling the presence of favorable witnesses at trial. Id. at 56. This right has never been

- 17 -

extended to include the right to discover the identity of witnesses or to require the government to produce witnesses who might give exculpatory testimony. Instead, the Supreme Court has concluded that the right of compulsory process "provides no greater protections in this area than those afforded by due process." Id.; see also United States v. Valenzuela-Bernal, 458 U.S. 858, 872-73 (1982).

The denial of Goins' extended discovery request was unrelated to his right to obtain government assistance in compelling the attendance of witnesses. Thus, the trial court did not deny Goins' right of compulsory process when it denied his discovery request.

C. Voir Dire

Goins requested the trial court to ask potential jurors questions from a prepared list. The trial court refused to ask certain questions.[3] Goins contends that the trial court erred in

_____

[3]The refused questions were:

What activities, if any, are you involved with at present for your church, temple, or other religious organization?
Have you ever been a member of an organization, religious or otherwise, that has taken a position opposed to legalized abortions? If so, what?
Have you personally taken a position in opposition to legalized abortions?
Are you a member of any organization, religious denomination, or other group that has taken a position in support of the death penalty?
Which political party do you usually support?
[H]ave you or a member of your family, or any close friend, ever had an opportunity to see the inside of a prison, jail, or other correctional facility?
What are your impressions of the ability of psychologists or

refusing to ask these questions because they were relevant to establishing relationship, interest, opinion, or prejudice. We disagree.

> Code § 8.01-358 provides that
> [t]he court and counsel for either party shall have the right to examine under oath any person who is called as a juror therein and shall have the right to ask such person or juror directly any relevant question to ascertain whether he is related to either party, or has an interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein.

This section provides a party the right to ask potential jurors
(..continued)
psychiatrists to understand the human mind?

What are your views as to the major causes of crime in our society?

Have you ever experienced fear of a person of another race? If so, what were the circumstances?

Do you think that African-Americans are more likely to commit crimes than whites? If so, why?

Tell us what your views are about the death penalty and why.

Why is the death penalty a good idea or not a good idea?

What is your opinion about the philosophy of "an eye for an eye" as it concerns the use of the death penalty as punishment for murder?

What types of situations do you think the death penalty might be appropriate for? In such situations, do you think the death penalty should always be imposed?

Do you think that imprisonment for life is a severe enough punishment for someone who has been convicted of any type of murder? Would the age of such a convicted person affect your thinking?

Where do your feelings about the death penalty come from? Have your feelings about it changed over the years?

Is your feeling about the death penalty strong enough to affect your vote in favor of or against a political candidate because of his or her position on the death penalty?

Occasionally one reads in the newspaper, or hears on T.V. news, about a person sentenced to death who was later found to be innocent. How does that fact affect your opinion about the death penalty?

Why do you think we are asking all these questions about the death penalty?

questions relevant to the statutory factors of relationship, interest, opinion, or bias.  A party has no right, however, "to extend voir dire questioning ad infinitum."  LeVasseur v. Commonwealth, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983), cert. denied, 464 U.S. 1063 (1984).  A party must have a full and fair opportunity to determine whether the statutory factors are present, but the trial court retains discretion to determine when a defendant has had such an opportunity.  Id.; Buchanan v. Commonwealth, 238 Va. 389, 401, 384 S.E.2d 757, 764 (1989), cert. denied, 493 U.S. 1063 (1990).

Here, the trial court permitted extensive questioning of potential jurors relevant to all statutory factors outlined in Code § 8.01-358.  Thus, since Goins had ample opportunity to ask relevant questions, and since the questions asked were sufficient to preserve Goins' right to trial by a fair and impartial jury, we hold that the trial court did not abuse its discretion in refusing to ask additional questions.  For these reasons, we also conclude that the refusal to ask these questions during voir dire did not violate Goins' rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

## V.  Guilt Phase Issues

In a pretrial motion and again at trial, Goins asked that the Commonwealth be prohibited from introducing into evidence a videotape of the crime scene and photographs of the victims and a

gun.  The trial court ordered that segments of the videotape be deleted, but denied Goins' motion with respect to the remaining portion of the tape and with respect to all the photographs. Goins argues that these items were calculated to arouse the jury's sympathies and were not needed to prove the Commonwealth's case.  Since the identification of the victims was not disputed, Goins contends that the prejudicial impact of the videotape and photographs outweighed their probative value.

Photographs and videotapes of crime scenes are admissible to show motive, intent, method, malice, premeditation, and the atrociousness of the crime.  Spencer v. Commonwealth, 238 Va. 295, 312, 384 S.E.2d 785, 796 (1989), cert. denied, 493 U.S. 1093 (1990); Stamper v. Commonwealth, 220 Va. 260, 270-71, 257 S.E.2d 808, 816 (1979), cert. denied, 445 U.S. 972 (1980).  If the photographs accurately depict the crime scene, they are not rendered inadmissible simply because they are gruesome or shocking.  Gray v. Commonwealth, 233 Va. 313, 343, 356 S.E.2d 157, 173, cert. denied, 484 U.S. 873 (1987).  Further, the admissibility of photographs and videotapes rests within the sound discretion of the trial court.  Id. at 342, 356 S.E.2d at 173; Swann v. Commonwealth, 247 Va. 222, 235, 441 S.E.2d 195, 204, cert. denied, ___ U.S. ___, 115 S.Ct. 234 (1994).

Here, the photographs and the videotape were relevant evidence.  The photographs, coupled with the testimony of the medical examiners, demonstrated the nature of the wounds and the

position of the victims after they were shot.  In addition, the videotape, which showed the positions of the victims relative to each other in the apartment, was relevant to the issue whether the shootings were willful, deliberate, and premeditated.  The videotape and the photographs also were relevant to the Commonwealth's theory of the sequence in which the shootings occurred.  We conclude that the probative value of this evidence outweighed any potential prejudicial effect and, thus, that the trial court did not abuse its discretion in admitting these items into evidence.

Goins also objected to the trial court's admission of the tape-recorded conversation between the "911" emergency operator and Tamika Jones, in which Tamika stated that Goins had shot the other people in the apartment.  Goins argues that Tamika's statement was not based on firsthand knowledge because she did not witness the shootings of five family members.  Thus, Goins contends that the statement is inadmissible hearsay.  The Commonwealth responds that the statement was properly admitted as an "excited utterance."  We agree with the Commonwealth.

A statement comes within the excited utterance exception to the hearsay rule and is admissible to prove the truth of the matter stated, when the statement is spontaneous and impulsive, thus guaranteeing its reliability.  Clark v. Commonwealth, 235 Va. 287, 292, 367 S.E.2d 483, 485 (1988).  "There is no fixed rule by which the question whether the statement is admissible as

an excited utterance can be decided.  Resolution of the issue depends upon the circumstances of each case."  Id., 367 S.E.2d at 486.

The statement must be prompted by a startling event and be made at such time and under such circumstances as to preclude the presumption that it was made as the result of deliberation. Goins v. Commonwealth, 218 Va. 285, 287, 237 S.E.2d 136, 138 (1977).  In addition, the declarant must have firsthand knowledge of the startling event.  See John W. Strong, McCormick on Evidence § 272 (4th ed. 1992).  The decision whether the statement qualifies as an excited utterance lies within the discretion of the trial court.  Clark, 235 Va. at 292, 367 S.E.2d at 486.

The totality of the circumstances surrounding Tamika's statement satisfies these requirements.  Tamika made the statement within minutes of the shootings, as soon as she believed that Goins had left the apartment.  Her statement, "[h]e shot them too," was not responsive to the question posed by the operator, nor was it prompted or suggested by the operator.

The record contains sufficient evidence to establish that Tamika was still acting under the agitation of the startling event, and that she spoke based on her firsthand knowledge of the screaming, the single set of footsteps in the hall, the gunshots, and her observation of Goins both before and after the shooting began.  These perceptions and observations were sufficient to

give her firsthand knowledge of all the events even though she did not see the killings take place.  Based on these circumstances, we conclude that the trial court did not abuse its discretion in admitting the tape-recorded conversation.

Goins also argues that the trial court erred in admitting Parrish Davis' testimony that Goins stated he wanted to "do away" with Tamika and her family.  Goins contends that this statement was inadmissible hearsay.  The Commonwealth responds that the statement was properly admitted under the "party admission" exception to the hearsay rule.

A statement made by a party is admissible in evidence against him.  "An admission deliberately made, precisely identified and clearly proved affords evidence of a most satisfactory nature and may furnish the strongest and most convincing evidence of truth."  Tyree v. Lariew, 208 Va. 382, 385, 158 S.E.2d 140, 143 (1967).  The admission may relate to a past act or to a future event.

A prior statement of a threatening nature made by a criminal defendant is admissible to prove premeditation.  For example, in Smith v. Commonwealth, 220 Va. 696, 702, 261 S.E.2d 550, 554 (1980), in which the defendant was tried for first degree murder, we held that the defendant's extrajudicial statement, "I've got it in for someone," was admissible as a party admission.

In the present case, the testimony of Davis precisely identified an admission that was deliberately made.  Like the

defendant's statement in Smith, Goins' statement provided evidence of premeditation. Nevertheless, Goins asserts that, since Davis did not believe that Goins "was being serious" when he made the statement, it was thereby rendered false and inadmissible. We disagree.

In the case of a party admission, the credibility of the extrajudicial declarant is not an issue affecting the admissibility of the statement, because the party need not cross-examine his own statement in order to be in a position to deny, contradict, or explain the statement. See Charles E. Friend, 2 The Law of Evidence in Virginia § 18-34 (4th ed. 1993). Therefore, we conclude that the trial court did not err in admitting this testimony into evidence.

Next, Goins contends that the trial court erred in admitting into evidence the business card of Parrish Davis. He argues that this evidence was irrelevant and prejudicial. We disagree.

Evidence is relevant if it has any logical tendency to prove an issue in a case. Coe v. Commonwealth, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986). Relevant evidence may be excluded only if the prejudicial effect of the evidence outweighs its probative value. The question whether the prejudicial effect of evidence exceeds its probative value lies within the trial court's discretion. Id.

Here, Davis' business card, which was found in Littlejohn's car, was relevant evidence that tended to corroborate Davis'

- 25 -

testimony about his acquaintance with Goins.  The card was not cumulative evidence and there is no indication that its admission had an undue prejudicial effect.  Therefore, we conclude that the trial court did not abuse its discretion in allowing the card into evidence.

Goins also contends that the various identification cards bearing his photograph with the name of Derrick Reardon, and the high school diploma issued in the name of Derrick Reardon, were inadmissible evidence of "prior bad acts."  He argues that this evidence was inadmissible because there was no direct link between that evidence and the elements of the crimes charged.  He further contends that the evidence was highly prejudicial because it encouraged the jury to make an impermissible inference that Goins was predisposed to criminal activity.

Evidence of other crimes or bad acts is inadmissible if it is offered merely to show that the defendant is likely to have committed the crime charged.  Kirkpatrick v. Commonwealth, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970).  However, such evidence is admissible if it tends to prove any element of the offense charged, even though it also tends to show that the defendant is guilty of another crime.  Woodfin v. Commonwealth, 236 Va. 89, 95, 372 S.E.2d 377, 380-81 (1988), cert. denied, 490 U.S. 1009 (1989).  Evidence of this nature will be permitted only when its probative value outweighs the incidental prejudice to the defendant.  Id.

Evidence of other crimes or bad acts may be admitted to prove the perpetrator's identity. Spencer v. Commonwealth, 240 Va. 78, 89, 393 S.E.2d 609, 617, cert. denied, 498 U.S. 908 (1990). The trial court is vested with discretion in deciding whether the evidence of prior bad acts has probative value that outweighs the prejudice to the accused. Id. at 90, 393 S.E.2d at 617.

Here, the identification cards and the diploma were relevant evidence tending to prove the identity of the perpetrator. This evidence linked Goins to Littlejohn and her apartment, where the Glock manual and the unfired .45 caliber cartridge were found. The potential prejudicial effect of this evidence was diminished by the fact that the Commonwealth did not link the identification cards and the diploma with the commission of another crime. Thus, we conclude that the trial court did not abuse its discretion in admitting this evidence.

Goins next argues that the trial court erred in allowing Detective Woody to testify that he found gun publications in Littlejohn's apartment. At trial, Goins' counsel based his objection on the fact that "[t]he police evidently did not seize any of those things . . . and it puts us at a terrible disadvantage in that we don't have the ability to cross-examine in reference to that." On appeal, however, Goins raises a different argument, namely, that this testimony was irrelevant and highly prejudicial.

We will not consider this new argument because it was not presented to the trial court. Rule 5:25. Likewise, we do not consider the objection Goins raised at trial because he has abandoned it on appeal.

Goins also argues that the trial judge erred in allowing Kenya Jones to be presented to the jury. Goins' counsel objected on the basis that "I don't know what purpose that serves." The trial court overruled the objection, stating that the presentation of Kenya was relevant evidence tending to identify her as the child who was shot. On appeal, Goins renews his argument that this evidence was irrelevant, but he also raises a new argument that the prejudicial effect of this evidence outweighed any probative value it might have had.

We will consider only the issue whether the evidence was relevant, because Goins did not raise in the trial court the issue of its prejudicial impact. Rule 5:25. We conclude that the presentation of Kenya to the jury was relevant to the issue whether Kenya was wounded by Goins, as well as to the nature and the location of her injury.

Goins next contends that the trial court erred in sustaining the Commonwealth's objection to the following question he attempted to ask the Commonwealth's firearms expert, Ann Jones:

If another expert were to testify in this matter that the results would be more conclusive if you had a weapon from the scene with which to fire test rounds in order to make a comparison, [would you agree that] . . . the results would be more conclusive?

Goins' counsel asked this question after Jones testified that her inability to test fire the murder weapon did not affect the weight of her conclusions concerning the cartridge casings she examined.

The Commonwealth objected to the question on the basis that the "defense could put on an expert if they wanted to prove their theory."  In response, Goins' counsel asserted that "another expert who has already testified in this court . . . took a different approach."  The trial court sustained the Commonwealth's objection, stating that the expert witnesses had not expressed any such differences in opinion.

Goins argues that the trial court's ruling resulted in the denial of his right to cross-examine Jones "fully and fairly."  We disagree, because the record shows that Jones and the other firearms expert, Pickelman, did not give contradictory testimony.

Jones and Pickelman examined different categories of items.  Jones examined the markings on the cartridge casings found at the crime scene as well as the markings on the unfired cartridge found in Littlejohn's apartment.  Based on this examination, she was able to conclude that all the cartridge casings had been ejected from the same .45 caliber Glock pistol.

Jones testified on cross-examination that her "results are very conclusive."  She also stated that her results would not be different if she had fired test rounds from the actual weapon used at the crime scene.

Pickelman did not state that test firing the actual murder weapon could have affected Jones' results.  As Pickelman indicated in his testimony, Jones only performed tests on the unfired cartridge and the cartridge casings, which originally house the jacketed bullets in the weapon before they are fired.  Pickelman's testimony did not evaluate these tests, but only dealt with his examination of the barrel markings found on the fired bullets, bullet jackets, and jacket fragments.  Thus, when Pickelman agreed that, if he had been able to fire test rounds from the actual murder weapon, he might have been able to determine conclusively whether the various spent bullets and bullet jacket fragments came from the same weapon, his testimony was unrelated to the materials and methods involved in the tests that Jones performed.

Goins next argues that the trial court erred in allowing the Commonwealth's attorney to ask Lamont Williams whether he had told his probation officer that he had a prior business relationship with Goins.  Goins contends that, since the Commonwealth's attorney earlier had attempted to ask Williams whether he had sold drugs for Goins, the later question raised an inference of unrelated criminal activity that did nothing more than impugn Williams' character and suggest that Goins was involved in selling drugs.  We disagree.

The bias of a witness, based on a previous relationship with a party to the case, is always a relevant subject of cross-

examination.  Norfolk & Western Railway Co. v. Sonney, 236 Va.

482, 488, 374 S.E.2d 71, 74 (1988); see Brown v. Commonwealth,

246 Va. 460, 464, 437 S.E.2d 563, 564-65 (1993).  The issue

whether a particular question may be asked about a witness' bias

is a matter submitted to the trial court's discretion.  Shanklin

v. Commonwealth, 222 Va. 862, 864, 284 S.E.2d 611, 612 (1981).

Here, the question allowed by the trial court was not

improper, and Williams denied that he had told his probation

officer he had a previous business relationship with Goins.

Further, the objections to the earlier questions were properly

sustained by the trial court.  Therefore, we conclude that the

trial court did not abuse its discretion in allowing the question

at issue.

Goins next contends that the trial court erred in refusing

his request to give the jury a cautionary instruction regarding

the videotape of computer-generated graphics that the

Commonwealth used during its closing argument in the guilt phase

of the trial.  Goins asked the trial court to instruct the jury

that, when a presentation is made "in such a high-tech fashion,"

it is afforded "no more credibility."  The trial court denied

Goins' request and indicated that Goins' counsel was free to make

this argument to the jury.

The decision whether to give a cautionary instruction is a

matter lying within the trial court's discretion and will not be

disturbed on appeal unless the record shows an abuse of

discretion.  See Johnson v. Commonwealth, 2 Va. App. 598, 605, 347 S.E.2d 163, 167 (1986).  Since Goins concedes that he did not object to the edited version of the tape that was shown to the jury, the trial court was not required to caution the jury concerning its form or its content.  Thus, the trial court did not abuse its discretion in denying the requested instruction.

Goins next argues that the evidence is insufficient to support his convictions.  Goins notes that Tamika did not see him shoot the murder victims, that Scott did not testify, that Scott's clothing was not tested for gunpowder residue, that the shootings of Tamika and Kenya were "radically different in character from the other shootings," and that no fingerprints were found on the bullet fragments recovered from the crime scene.

Goins also observes that drugs were found "on the person of one of the victims and in the system of another victim," and that no murder weapon was found.  Finally, he contends that Parrish Davis' testimony was inherently incredible as a matter of law, and that the unfired cartridge found in the second search of Littlejohn's apartment may have been "planted" there after the first search conducted by the police.

The standard for reviewing the sufficiency of the evidence on appeal is well established.  We must examine the evidence in the light most favorable to the Commonwealth, the prevailing party at trial, and we will not disturb the trial court's

judgment unless it is plainly wrong or without evidence to support it.  Beavers, 245 Va. at 281-82, 427 S.E.2d at 421; Code § 8.01-680.

In the present case, the evidence established that Goins told Davis that he wanted to kill Tamika and her family after she had told her parents that she was pregnant by Goins.  Further, on the morning of the murders, Goins became angry when asked to look at an ultrasound photograph of the fetus.

Tamika saw Goins in the apartment that morning before she went to her bedroom, and she heard him speaking in the kitchen before the gunfire began.  After hearing the first gunshots, screaming, and the sound of her brother crying, Tamika heard more gunshots, the sound of a single set of footsteps in the hall, and then an additional series of gunshots.  Goins appeared at Tamika's bedroom door and Tamika saw him shoot her as she attempted to shield her sister, Kenya, from the shots.

After the murders, Goins asked Davis to drive him away from Richmond in the trunk of a car.  Goins and Littlejohn ultimately fled to New York and, when Goins was arrested, his appearance was altered.

The evidence also established that all the fired cartridges, bullets, and bullet jacket fragments retrieved from the crime scene were fired from the same .45 caliber automatic pistol.  The cartridge casings were identified conclusively as having been fired from the same .45 caliber automatic Glock pistol.

- 33 -

In the apartment where Goins lived with Littlejohn, the police found a Glock instruction manual, as well as an unfired cartridge case.  Scientific analysis performed on the unfired cartridge case showed conclusively that the case had been ejected from the same .45 caliber Glock pistol used to fire the spent cartridges.

Although Tamika and Kenya were the only victims who were not shot in the head, this fact fails to support Goins' argument that another person must have shot the victims who died.  An hypothesis of innocence must arise from the evidence rather than from the imagination of defense counsel.  Spencer v. Commonwealth, 238 Va. 275, 283-84, 384 S.E.2d 775, 779 (1989), cert. denied, 493 U.S. 1036 (1990).  Moreover, there is no evidence indicating that anyone other than Goins shot the murder victims.  Thus, we conclude that the jury's verdict is fully supported by the evidence.

VI.  Penalty Phase Issues

Goins also argues that the trial court erred in allowing the Commonwealth to introduce evidence of "future dangerousness." Goins asserts that, since he had not been convicted of any crimes when he was tried for the present offenses, the Commonwealth could not seek the death penalty based on this predicate.  We disagree.

We specifically rejected this argument in Murphy v. Commonwealth, 246 Va. 136, 144, 431 S.E.2d 48, 53, cert. denied,

- 34 -

510 U.S. ___, 114 S.Ct. 336 (1993), in which the defendant argued that the absence of a felony record or any history of violence precluded a finding of "future dangerousness." Our holding was based on the language of Code § 19.2-264.4(C), which states in relevant part:

> The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant <u>or</u> of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society. [Emphasis added.]

This language plainly states in the disjunctive the evidentiary standard for imposition of the death penalty based on "future dangerousness." Thus, it is not necessary that a defendant have a prior criminal record before the Commonwealth presents evidence of "future dangerousness" to the trier of fact.

Goins next contends that the evidence was insufficient to support the jury's findings of "vileness" and "future dangerousness." However, he offers no rationale in support of this argument.

We disagree with Goins' conclusory assertion. A finding of "vileness" must be based on conduct which is "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim." Code § 19.2-264.2. Proof of any one of these three components will support a finding of vileness. <u>Id.</u>; <u>Mueller v. Commonwealth</u>, 244 Va. 386, 411, 422 S.E.2d 380, 395 (1992), <u>cert. denied</u>, 507 U.S.

1043 (1993). We hold that the evidence sufficiently established Goins' aggravated battery of Robert Jones, as well as Goins' depravity of mind.

First, the record establishes that Goins perpetrated an aggravated battery on Robert Jones within the meaning of Code § 19.2-264.2. This Court has defined "aggravated battery" in this context to mean "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." Smith v. Commonwealth, 219 Va. at 478, 248 S.E.2d at 149. The evidence established that Goins shot Robert, a three-year-old boy, twice in the head. Both these gunshot wounds were lethal.

The record also contains sufficient evidence to establish Goins' depravity of mind. Robert Jones was a defenseless, innocent child. Nevertheless, Goins decided to kill him, conducting an execution-style slaying, merely because Robert was related to Tamika.

The record also contains sufficient evidence to support the jury's finding of "future dangerousness." The circumstances surrounding the commission of the capital murder of Robert Jones were sufficient to establish beyond a reasonable doubt that Goins would commit future criminal acts of violence that would constitute a continuing threat to society. See Code § 19.2-264.4(C). Goins planned and executed the murders of five innocent persons, three of whom were children. Four of the five

murder victims received multiple gunshot wounds.  In addition, Goins maliciously wounded two other victims.  These facts provided sufficient evidence from which the jury could conclude that Goins placed no value on human life and would kill others whenever it suited him to do so.

### VII.  Sentence Review

Code § 17-110.1(C) requires us to review the imposition of the death sentence on Goins to determine whether (1) it was imposed under the influence of passion, prejudice, or any other arbitrary factor; or (2) it is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

In support of his contention that the death sentence was imposed under the influence of passion, prejudice, or other arbitrary factor, Goins incorporates by reference all his previous assignments of error.  However, since we have found no error in the trial court's rulings on those matters, we reject this argument.  See Roach v. Commonwealth, 251 Va. 324, ___, ___ S.E.2d ___, ___ (1996); Pope v. Commonwealth, 234 Va. 114, 127, 360 S.E.2d 352, 360 (1987), cert. denied, 485 U.S. 1015 (1988); Wise v. Commonwealth, 230 Va. 322, 335, 337 S.E.2d 715, 723 (1985), cert. denied, 475 U.S. 1112 (1986).  Additionally, our independent review of the trial record fails to disclose that the sentence of death was imposed under the influence of any of these statutory factors.

In conducting our proportionality review, we must determine "whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." Jenkins v. Commonwealth, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992), cert. denied, 507 U.S. 1036 (1993); see also Code § 17-110.1(C)(2). We have examined the records of all capital murder cases reviewed by this Court, under Code § 17-110.1(E), including those cases in which a life sentence was imposed. We have given particular attention to those cases in which the death penalty was based on both the "future dangerousness" and the "vileness" predicates.

Based on this review, we conclude that Goins' death sentence is not excessive or disproportionate to penalties generally imposed by other sentencing bodies in the Commonwealth for comparable crimes. Such sentencing bodies generally impose the death sentence for a capital murder in which the defendant is also convicted of murdering another person or persons. See, e.g., Burket v. Commonwealth, 248 Va. 596, 450 S.E.2d 124 (1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1433 (1995); Stewart v. Commonwealth, 245 Va. 222, 427 S.E.2d 394, cert. denied, 510 U.S. ___, 114 S.Ct. 143 (1993); Jenkins v. Commonwealth, 244 Va. 445, 423 S.E.2d 360; Davidson v. Commonwealth, 244 Va. 129, 419 S.E.2d 656, cert. denied, 506 U.S. 959 (1992); Thomas v. Commonwealth, 244 Va. 1, 419 S.E.2d 606, cert. denied, 506 U.S. 958 (1992); Buchanan v. Commonwealth, 238 Va. 389, 384 S.E.2d 757.

VIII.  Conclusion

We find no reversible error in the judgments of the trial court.  Having reviewed Goins' death sentence pursuant to Code § 17-110.1, we decline to commute the sentence of death.  Accordingly, we will affirm the trial court's judgments.

Record No. 951869 – <u>Affirmed</u>.
Record No. 951870 – <u>Affirmed</u>.