## Richmond

### MICHAEL LEE ELLIOTTE

v.

### COMMONWEALTH OF VIRGINIA

No. 1338-86-2

Decided October 4, 1988

COUNSEL

Andrea C. Long (Boone, Beale, Cosby & Hyder, on brief), for appellant.

Birdie H. Jamison, Assistant Attorney General (Mary Sue Terry, Attorney General; W. Mark Dunn, Assistant Attorney General, on brief), for appellee.

OPINION

BENTON, J. — Upon his conviction of possession of cocaine with intent to distribute in violation of Code § 18.2-248, Michael Lee Elliotte was sentenced to fourteen years in the penitentiary with six years suspended and fined $1,000. Elliotte contends that (1) the evidence was obtained in violation of his fourth amendment rights during a warrantless entry into his residence; and (2) the evidence was insufficient to prove that he knowingly and intentionally possessed cocaine. We hold that because there was no valid consent to the entry, no warrant, and no recognized exception to justify a warrantless search, all evidence obtained during the search should have been suppressed. We, therefore, reverse the conviction.

At the suppression hearing, Detective Dickerson testified that another police officer had received "a complaint of loud music and parties going on all night" at Elliotte's house. The police officer informed Dickerson that the house apparently was operated as a club and "that his information was that anybody could gain entry into it." Suspecting that an illegal public night club was being operated, Detectives Dickerson and Coleman went to Elliotte's home for the purpose of purchasing alcoholic beverages. Dickerson testified that his plan was to gain access by knocking on the door and then to buy a drink once inside. Dickerson further testified that if he were stopped at the door, he was prepared to identify himself, to explain that there were complaints about an illegal club, and to request to see the owner of the house.

At approximately 1:15 a.m., Dickerson and Coleman approached the house at the same time as four other men. One of the four men opened the screen door and knocked on the inside door. A man, later identified as Marvin Sampson, opened the inside door, said, "How ya'll doing? Come on in!," and stepped back to allow the men to enter. Sampson shook hands with each of the first four men as they entered. Dickerson next moved forward with his badge in hand, but not displayed. When Dickerson had one foot in the house and the other on the threshold, Sampson "looked, and he said 'police.'" Sampson then turned away and continued to say "police, police" as he walked quickly toward the kitchen through a group of people.

Dickerson "was right behind him" and followed Sampson into the kitchen. When Dickerson entered the kitchen, he saw Ellliotte seated at a table, another man standing beside the table, and two plastic bags of cocaine on the table. Dickerson moved toward Elliotte, who was reaching toward the table, and grabbed him from behind. Dickerson testified that at the time Elliotte said: "Don't worry about that. I got the rest of it in my pocket. Take it out of my pocket, put it in your pocket, and we'll talk about it later." Dickerson reached into Elliotte's pocket and pulled out a large plastic bag with thirty-two smaller bags of cocaine within it.

Elliotte filed a motion to suppress cocaine on the ground that Sampson neither consented to the entry of the officers nor had the authority to admit the officers. The circuit judge found "that the close was broken; that the officer was admitted into the dwelling by one who had, or appeared to have authority to do so, for the

officer was lawfully upon the premises; [and that] the officer was never ordered out of the dwelling by anyone." Based upon those findings the circuit judge denied the motion.

■ In *Welsh v. Wisconsin*, 466 U.S. 740 (1984), the Supreme Court stated:

> It is axiomatic that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest. It is not surprising, therefore, that the Court has recognized, as "a 'basic principle of Fourth Amendment Law' that searches and seizures inside a home without a warrant are presumptively unreasonable."

*Id.* at 748-49 (citations omitted). Thus, it is well established that "the Fourth Amendment has drawn a firm line at the entrance to the house." *Peyton v. New York*, 445 U.S. 573, 590 (1980).

■ The Commonwealth argues that the entry in this case was not violative of the fourth amendment because Elliotte had relinquished his expectation of privacy in his home by using it as a public place and because the police were invited to enter. In support of this proposition, the Commonwealth cites *Lewis v. United States*, 385 U.S. 206, 211 (1966) (when a "home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, . . . [it] is entitled to no greater sanctity than if it were carried on in [any other public place]"), *Commonwealth v. D'Onofrio*, 396 Mass. 711, 716-17, 488 N.E.2d 410, 413-14 (1986) (defendants had no reasonable expectation of privacy in an after-hours private club when an officer's testimony established that he was not a member of the club but was freely admitted on several occasions), and *State v. Carey*, 417 A.2d 979, 981-82 (Me. 1980) (fraternity member did not have a legitimate expectation of privacy during the illegal sale of alcoholic beverages in a fraternity house party open by invitation to the public). The findings in *Lewis, D'Onofrio,* and *Carey* that there were no reasonable expectations of privacy, however, were all premised on a finding that the police gained entry onto the premises by invita-

tion as either a member of the general public or as an individual specifically invited to conduct illegal business within the home. Thus, although inviation or "consent" could form the basis of a finding that no reasonable expectation of privacy exists, that a person is engaged in crimanal conduct within his home does not, standing alone, destroy a homeowner's expectation of privacy. *United States v. Whaley*, 779 F.2d 585, 590 n.8 (11th Cir. 1986), *cert. denied*, 107 S. Ct. 931 (1987).

▆▆ When there has been a warrantless entry in a home by police authority, "[i]t is well settled that the burden is on the Commonwealth to establish an exception to the warrant requirement." *Walls v. Commonwealth*, 2 Va. App. 639, 645, 347 S.E.2d 175, 178 (1986); *see also United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Verez v. Commonwealth*, 230 Va. 405, 410-11, 337 S.E. 2d 749, 753 (1985), *cert. denied*, 107 S. Ct. 63 (1986). One established exception to the warrant and probable cause requirements of the fourth amendment is conduct pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). In order to justify a warrantless search on the basis of consent, the Commonwealth must demonstrate from the totality of the circumstances that the consent was voluntary. *Id.* at 248-49. However, the Commonwealth's "burden is heavier where the alleged consent is based on implication." *Walls*, 2 Va. App. at 645, 347 S.E.2d at 178.

The initial determination that we must make, however, is not whether the consent was voluntary, but whether consent or an invitation to enter in fact was given. We conclude that the evidence is insufficient to support a finding that either Sampson, who answered the door, or Elliotte consented to the detectives' entry by inviting the general public or by inviting Dickerson and Coleman specifically into the home.[1] There was no testimony at the suppression hearing that activities within Elliotte's home were readily visible from the outside of his home. Rather, the testimony demonstrated that, consistent with an expectation of privacy, the door was closed. Testimony that persons had to knock on the door before gaining entrance is inconsistent with an inference that Elliotte's home was open to the public. Moreover, the sole evidence that Elliotte's home was open to the public was Dickerson's testimony that police had received complaints of loud music and

---

[1] We do not address whether Sampson had authority to respond to knocks at the door because Elliotte concedes that he had such authority.

late parties and that the police suspected Elliotte was running an illegal "public" night club out of his home. Such evidence does not suffice to carry the Commonwealth's burden of demonstrating the existence of an implied invitation to the public to enter a home.

The circumstance of the entry of the four men also does not suport an inference that the house was open to the public. The detectives went to the house at night and were behind four other men when they approached the door. The four men knocked at the door, were greeted individually, and admitted. Sampson did not shake Dickerson's hand or otherwise extend a greeting, but instead said "police" and then turned saying "police, police" as he moved away. These circumstances do not reasonably support an inference that the house was open to the public or that the detectives were invited specifically to enter.

Furthermore, there is nothing in the testimony to support an inference that when Sampson opened the door and said "How ya'll doing? Come on in!" that he was speaking to Dickerson and Coleman who were at the rear of the group of four men. When the trial judge asked Dickerson whether all six people were in a position to be seen by Sampson, Dickerson's testimony that Sampson was in a position to see all six people as they were "coming in" does not address whether Sampson saw and was speaking to all six men at the time he said "Come on in!" Although Dickerson stated that he was looking at Sampson the whole time, there is no testimony that Sampson was looking at the detectives or could see the detectives until Sampson saw Dickerson at the threshold and said "police."

 "Consent to a search . . . must be unequivocal, specific and intelligently given . . . and it is not lightly to be inferred." *Via v. Peyton*, 284 F. Supp. 961, 967 (W.D. Va. 1968). In view of the darkness, the position of the detectives at the rear of a group of men at the time Sampson said "come on in," and the lack of evidence in the record stating with whom Sampson made eye contact, Sampson's statement, "How ya'll doing? Come on in," is so equivocal and non-specific an invitation, this Court will not presume such words to be a consent or invitation sufficient to satisfy an exception to the fourth amendment warrant requirement. Moreover, invitiation or consent cannot be inferred from Sampson's failure to either physically or verbally resist the entry.

*Walls*, 2 Va. App. at 646, 347 S.E.2d at 179. Neither can the fact that Sampson opened the door or failed to close the door behind him as he announced "police" be construed as an invitation to enter. *See United States v. Wenzel*, 485 F. Supp. 481, 483 (D. Minn 1980); *Walls*, 2 Va. App. at 646, 347 S.E.2d at 178. Certainly, his response, "police," cannot be taken as an invitation to enter. The evidence, therefore, establishes that Elliotte had an objective reasonable expectation of privacy in his home, and it further demonstrates that the "government's intrusion infringe[d] upon the personal and societal values protected by the fourth amendment." *Oliver v. United States*, 466 U.S. 170, 182-83 (1984).

We hold that because the Commonwealth failed to establish a consensual entry or any other exception to the fourth amendment, the detectives' entry into Elliotte's home was violative of the fourth amendment and the trial court erred in refusing to grant the motion to suppress the evidence. Accordingly, the judgement of conviction is reversed. Furthermore, because without the evidence acquired as a result of the unlawful entry there was no evidence to support the conviction, the indictment is dismissed. *See Zimmerman v. Commonwealth*, 234 Va. 609, 613, 363 S.E.2d 708, 710 (1988).

*Reversed and dismissed.*

Koontz, C.J., and Cole, J., concurred.