COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Annunziata and Senior Judge Coleman
Argued by teleconference


MICHAEL MEGEL
                                          OPINION BY
v.   Record No. 1480-98-4         JUDGE ROSEMARIE ANNUNZIATA
                                         MARCH 19, 2002
COMMONWEALTH OF VIRGINIA


          UPON A REMAND FROM THE SUPREME COURT OF VIRGINIA

            FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                    Leslie M. Alden, Judge

          Marvin D. Miller (Law Offices of Marvin
          D. Miller, on brief), for appellant.

          John H. McLees, Jr., Senior Assistant
          Attorney General (Mark L. Earley, Attorney
          General, on brief), for appellee.


     This matter comes before the Court on remand from the

Supreme Court of Virginia.  Megel v. Commonwealth, 262 Va. 531,

537, 551 S.E.2d 638, 642 (2001).  Michael Megel was indicted in

the Circuit Court of Fairfax County for possession of firearms

by a convicted felon, in violation of Code § 18.2-308.2.  He

filed a motion to suppress the evidence of the firearms, found

in a warrantless search of his home.  Denying the motion, the

trial judge ruled that the search was lawful because (i) Megel

had no reasonable expectation of privacy in his home while he

was in the electronic incarceration program and (ii), in

addition, "Megel consented to the officer's request to search,

thus, obviating the need for a warrant."  Megel was thereafter

convicted of the charged offense in a trial by jury and

sentenced by the trial court to twelve months in jail, in

accordance with the jury's verdict.

Megel appealed the conviction to this Court.  In his

petition for appeal, Megel presented the following four

questions:

> 1.  Is participation in an electronic home
> detention program a per se waiver of Fourth
> Amendment rights of privacy in the home one
> shares with others?
>
> 2.  Can a court deny the defense access to
> exculpatory evidence indicating perjury on
> the part of a key prosecution witness?
>
> 3.  Can a court quash a defense subpoena
> duces tecum for exculpatory evidence on
> which the defense wishes to rely to
> establish perjury on the part of a key
> prosecution witness without the court first
> reviewing the information at issue so that
> it knows for itself what is in controversy?
>
> 4.  Is the defense entitled to its theory of
> the case instructions in its words so long
> as the instructions are consistent with the
> facts and the law?

We granted an appeal on Questions 1, 2 and 3.

A panel of the Court, with one judge dissenting, affirmed

the judgment, and held that Megel had no reasonable expectation

of privacy in his home while in the electronic incarceration

program.  Megel v. Commonwealth, 31 Va. App. 414, 524 S.E.2d 139

(2000).  On rehearing en banc, the full Court of Appeals

affirmed the conviction for the reasons stated in the panel

opinion.  Megel v. Commonwealth, 33 Va. App. 648, 536 S.E.2d 451 (2000) (en banc).  The Supreme Court reversed the conviction, annulled the judgment of the Court of Appeals, and remanded the matter to this Court for consideration of the issue of consent. Megel, 262 Va. at 537, 551 S.E.2d at 642.  "Although [the Supreme Court] question[ed] whether Megel raised [the issue of consent] before the Court of Appeals, [the Supreme Court left] that determination to the Court of Appeals."  Id.  We hold that Megel's appeal on this issue is procedurally barred.

On appeal, we will consider "[o]nly those arguments presented in the petition for appeal and granted by this Court . . . ."  Alexander v. Commonwealth, 28 Va. App. 771, 776, 508 S.E.2d 912, 914, aff'd on reh'g en banc, 30 Va. App. 152, 515 S.E.2d 808 (1999); see Cruz v. Commonwealth, 12 Va. App. 661, 664 n.1, 406 S.E.2d 406, 407 n.1 (1991).  Rule 5A:12(c) specifically provides that "[o]nly questions presented in the petition for appeal will be noticed by the Court of Appeals." See also Rule 5A:20(c).  Although Megel argued the issue of consent in his petition for appeal, he failed to include the issue of consent in the questions he presented on appeal.  None of the questions presented in the petition for appeal challenged the trial judge's finding that Megel voluntarily consented to the search in question.

Because Megel failed to raise the issue of consent as a question presented in his petition for appeal, his challenge to

the trial judge's finding that he consented to the search is procedurally barred.  We accordingly affirm his conviction.

<u>Affirmed.</u>

Tuesday        31st

October, 2000.

Michael Megel,                                              Appellant,

  against        Record No. 1480-98-4
                 Circuit Court No. CR-93115

Commonwealth of Virginia,                                    Appellee.


Upon a Rehearing En Banc

Before Chief Judge Fitzpatrick, Judges Benton, Willis, Elder,
Bray, Annunziata, Bumgardner, Frank, Humphreys and Clements

>           Marvin D. Miller (Law Offices of
>           Marvin D. Miller, on briefs), for
>           appellant.
>
>           John H. McLees, Jr., Senior Assistant
>           Attorney General (Mark L. Earley,
>           Attorney General, on brief), for
>           appellee.


By published opinion dated February 1, 2000, a divided panel of this Court affirmed the judgment of the trial court. We stayed the mandate of that decision and granted rehearing en banc.

Upon rehearing en banc, it is ordered that the stay of the February 1, 2000 mandate is lifted, and the judgment of the trial court is affirmed for the reasons set forth in the majority panel opinion.

Judge Benton dissents for the reasons set forth in the panel dissent.

It is ordered that the trial court allow counsel for the appellant an additional fee of $200 for services rendered the appellant on the rehearing portion of this appeal, in addition to counsel's costs and necessary direct out-of-pocket expenses. This amount shall be added to the costs due the Commonwealth in the February 1, 2000 mandate.

This order shall be published and certified to the trial court.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

                                        Tuesday        28th

        March, 2000.


Michael Megel,                                          Appellant,

   against        Record No. 1480-98-4
                  Circuit Court No. CR-93115

Commonwealth of Virginia,                               Appellee.



                Upon a Petition for Rehearing En Banc

    Before Chief Judge Fitzpatrick, Judges Benton, Coleman, Willis,
         Elder, Bray, Annunziata, Bumgardner, Lemons and Frank


        On February 15, 2000 came the appellant, by court-appointed counsel, and filed a petition praying that the Court set aside the judgment rendered herein on February 1, 2000, and grant a rehearing en banc thereof.

        On consideration whereof, the petition for rehearing en banc is granted, the mandate entered herein on February 1, 2000 is stayed pending the decision of the Court en banc, and the appeal is reinstated on the docket of this Court.

        The parties shall file briefs in compliance with Rule 5A:35. The appellant shall attach as an addendum to the opening brief upon rehearing en banc a copy of the opinion previously rendered by

the Court in this matter. It is further ordered that the appellant shall file with the clerk of this Court ten additional copies of the appendix previously filed in this case.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

Present:  Judges Benton, Annunziata and Senior Judge Duff
Argued at Alexandria, Virginia


MICHAEL MEGEL
                                              OPINION BY
v.    Record No. 1480-98-4            JUDGE CHARLES H. DUFF
                                         FEBRUARY 1, 2000
COMMONWEALTH OF VIRGINIA


                 FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                        Leslie M. Alden, Judge

              Marvin D. Miller (Law Office of Marvin D.
              Miller, on briefs), for appellant.

              (Mark L. Earley, Attorney General; John H.
              McLees, Jr., Assistant Attorney General, on
              brief), for appellee.


     Michael Megel, appellant, was convicted by a jury of

possessing a firearm after having been convicted of a felony and

was sentenced to serve twelve months in jail.

     On appeal, appellant contends the trial court erred in

denying his motion to suppress evidence seized by the police

from his home without a warrant while he was serving a sentence

in the Electronic Incarceration Program (EIP).  Appellant also

contends the Commonwealth unlawfully denied him access to

psychiatric records which he could have used to impeach a

Commonwealth's witness.  He further contends the trial court

should have reviewed the psychiatric records before denying his

post-trial request for a subpoena <u>duces</u> <u>tecum</u> to obtain the documents.  Finding no error, we affirm.

FACTS[1]

On October 22, 1996, the Fairfax County General District Court found appellant guilty of unlawful entry.  Appellant received a twelve month jail sentence with six months suspended upon the condition that he remain of good behavior.  The conviction order provided that appellant's sentence was to be served through "electronic incarceration."

Appellant entered the EIP program on February 21, 1997.  He executed a written agreement to follow certain restrictions as a condition of being incarcerated in his home.  Among these rules were the requirements that appellant submit to random urine tests, continuously wear a monitoring device on his ankle,

---

[1] After the petition for appeal was granted in this case, several transcripts (a partial transcript dated February 9, 1998 and transcripts of hearings held on November 5, 1997 and on January 12, 1998) were forwarded to this Court from the clerk's office of Fairfax County Circuit Court.  "'After the record has been transmitted to this Court pursuant to [the Rules of Court] and an appeal has been granted, the record on appeal cannot be enlarged except by our award of a writ of certiorari under Code § 8.01-673.'"  <u>Watkins v. Commonwealth</u>, 26 Va. App. 335, 341, 494 S.E.2d 859, 862 (1998) (quoting <u>Godfrey v. Commonwealth</u>, 227 Va. 460, 465, 317 S.E.2d 781, 784 (1984)).  Appellant did not request, nor did we issue, a writ of certiorari to compel the transcripts to be forwarded to this Court.  Accordingly, we do not consider them, despite their inclusion in the appendix.

refrain from possessing weapons or intoxicating substances, and be subject to random, unannounced home visits by the sheriff.[2]

Acting upon an anonymous tip that appellant had a large bag of cocaine at his residence, Fairfax County Deputy Sheriff Ron Kidwell and Detectives Dan Janickey and Jule Longerbeam of the Fairfax County Police went to appellant's home on July 22, 1997. Janickey and Longerbeam were wearing civilian clothing, and Kidwell was in uniform. The officers did not possess a warrant to search appellant's home.

Kidwell knocked on the door and Veronica Barnick, appellant's girlfriend, answered. Kidwell asked for appellant, and Barnick admitted the officers to the apartment. Appellant, Barnick, and their baby were in the living room of the apartment. Kidwell asked appellant if they could look around. Appellant said, "go ahead." Janickey and Longerbeam quickly checked the other rooms in the apartment to ensure that no one else was present.

Janickey and Longerbeam then returned to appellant and his girlfriend. Janickey told appellant the police had received information that appellant might have drugs in the house. Janickey asked if appellant had any drugs. Appellant said he did not. Janickey asked appellant if he "would mind" if the officers looked around the apartment. Appellant replied that

_____

[2] The record contains no evidence of a written agreement permitting the police to search appellant's residence without a

the officers were "welcome to look around" because they were "not going to find anything."

Janickey and Longerbeam proceeded to the bedroom.  In the bottom drawer of a dresser, among men's underwear and socks, the officers found two handguns, a .357 caliber revolver and a .22 caliber revolver.  In the dresser on the opposite side of the room the police found women's undergarments.

The officers asked appellant, a previously convicted felon, about the guns.  Appellant said the .22 caliber belonged to his girlfriend.  Appellant said he had purchased the .357 for $150 as a wedding present for someone.  Knowing that appellant previously had been convicted of a felony, Kidwell began to laugh.  Appellant then became nervous and upset.  Contrary to his earlier statement, appellant said his girlfriend had purchased the .357 caliber as a wedding present for someone.

The officers testified at the suppression hearing that they obtained appellant's verbal consent to search the home. Appellant denied consenting to the search but believed he was required to permit the sheriff to search his home during any home visit.

At trial, the Commonwealth called Barnick as a witness. Barnick testified that both of the guns found in the apartment belonged to appellant.  She said he had owned one of them for almost a year and the other for only a few days prior to the

warrant during his participation in the EIP.

search.  Barnick admitted she initially told the police the guns were hers because appellant had advised her to do so.  During cross-examination, Barnick denied that she was receiving care at a mental health facility called Woodburn, that she had ever been prescribed any medications through Woodburn, and that she was then on medication.  Although she and appellant were no longer living together at the time of appellant's trial, she spent holidays with appellant's parents.  She said that custody of the child she and appellant shared had "never been an issue." During her rebuttal testimony, Barnick admitted she had met with appellant's attorney a week earlier in preparation for appellant's trial.

## ANALYSIS

### The Suppression Ruling

The trial court denied appellant's motion to suppress, finding that appellant retained no expectation of privacy in his home while he was serving his sentence in the EIP.  In its letter opinion denying the motion, the trial court further found that appellant consented to the search, "thus obviating the need for a warrant."

In reviewing a trial court's ruling on a motion to suppress, we view the evidence in the light most favorable to the prevailing party, the Commonwealth in this instance.  See Greene v. Commonwealth, 17 Va. App. 606, 608, 440 S.E.2d 138, 139 (1994).  "In performing such analysis, we are bound by the

trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them[,] and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers."  McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc).

The Fourth Amendment to the Constitution of the United States protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. Const. amend IV.  "[T]he Fourth Amendment protects people, not places."  Katz v. United States, 389 U.S. 347, 351 (1967).

> But the extent to which the Fourth Amendment
> protects people may depend upon where those
> people are. . . . [The] "capacity to claim
> the protection of the Fourth Amendment
> depends . . . upon whether the person who
> claims the protection of the Amendment has a
> legitimate expectation of privacy in the
> invaded place."

Minnesota v. Carter, 525 U.S. 83, 88 (1998) (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)).

> A court must determine whether the
> individual maintains a legitimate
> expectation of privacy in the object or
> premises to be searched, which involves a
> two-part inquiry.  First, we must determine
> whether the individual has manifested "a
> subjective expectation of privacy" in the
> object of the challenged search.  This
> inquiry is a factual determination to which
> we must give deference on appeal.  Second,
> we must determine whether the expectation of
> privacy is objectively reasonable, one that

> society is willing to recognize as
> legitimate.  This is a legal determination,
> requiring no deference on review.

Johnson v. Commonwealth, 26 Va. App. 674, 683-84, 496 S.E.2d 143, 148 (1998).  But see Smith v. Maryland, 442 U.S. 735, 741 n.5 (1979) (noting that "where an individual's subjective expectations ha[ve] been 'conditioned' by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously c[an] play no meaningful role in ascertaining what the scope of Fourth Amendment protection [is]").

First, we consider whether appellant manifested a subjective expectation of privacy in his home during his participation in the EIP.[3]  The trial court found as a fact that, based upon appellant's testimony at the suppression hearing, appellant believed he was required to permit the police to search his home at any time police officers arrived for a home visit.  Indeed, appellant's apparent willingness to allow the officers to search his home supports this conclusion.  We are bound to give deference to this finding of fact.  See Johnson, 26 Va. App. at 684, 496 S.E.2d at 148.

-------

[3] In his brief, appellant cites numerous cases discussing the validity of a waiver of the right to be free from unreasonable searches and seizures.  This line of argument presumes a finding that appellant had a reasonable expectation of privacy in his home at the time of the search.  Absent such an expectation, the question of waiver is irrelevant.

Second, assuming appellant manifested a subjective expectation of privacy, we determine whether society is prepared to recognize as reasonable an expectation of privacy in the home of a participant in a program such as the EIP.  Through the EIP, a person who has been convicted of a criminal offense, under certain circumstances, may be permitted to serve his or her sentence through "home/electronic incarceration" as administered by a supervising authority such as the sheriff's department.[4] Code § 53.1-131.2(C) provides that "if the offender violates any provision of the terms of the home/electronic incarceration agreement, the offender may have the assignment revoked and, if revoked, shall be held in the jail facility to which he was originally sentenced."  If an EIP participant, "without proper authority or just cause, leaves his place of home/electronic incarceration, the area to which he has been assigned to work or attend education or other rehabilitative programs, or the vehicle or route of travel involved in his going to or returning from such place," he or she is guilty of a Class 2 misdemeanor. Code § 53.1-131.2(E).

Among the rules of participation in the EIP, which appellant acknowledged in writing, was the condition that

_____

[4] Code § 53.1-131.2 further provides for participation in EIP for those accused of crimes pending trial.  See Code § 53.1-131.2.  In deciding the present case, we do not consider whether a participant in EIP who does not stand convicted and sentenced for a crime has an expectation of privacy in his place of confinement.

members of the sheriff's department would be permitted to visit the home where appellant was confined.  Appellant was further advised of the numerous prohibited acts which could result in his removal from the program or disciplinary action.  If appellant disobeyed the rules of the EIP, he was subject to being incarcerated in jail instead of at home.

Under such circumstances, a participant in the EIP is far more restricted than one on probation or parole.  A probationer or parolee generally enjoys freedom of movement; an EIP participant enjoys no such right.  Thus, participation in the EIP is more analogous to a person serving time in a jail or prison.  The participant's home is the functional equivalent of a jail or prison cell.  In Hudson v. Palmer, 468 U.S. 517 (1984), the United States Supreme Court considered whether an inmate in a penal institution has a right to privacy in his prison cell entitling him to Fourth Amendment protection against unreasonable searches.  The Court stated:

> [W]hile persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights.  These constraints on inmates, and in some cases the complete withdrawal of certain rights, are "justified by the considerations underlying our penal system."  The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of "institutional needs and objectives" of prison facilities, chief among which is internal security.  Of course, these restrictions or retractions also serve, incidentally, as reminders that,

under our system of justice, deterrence and retribution are factors in addition to correction.

Id. at 525 (citations omitted). The Court held that

society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.

Id. at 526.

At the time of the challenged search, appellant was serving a sentence, albeit in his home, following the conviction of a crime. Appellant was subject to the rules and regulations of the EIP. If he failed to abide by those conditions, he was subject to further disciplinary action, removal from the program, and incarceration in jail. We find that, for purposes of the Fourth Amendment, appellant's home was the functional equivalent of a jail cell. As one author has stated,

[E]lectronic incarceration appears to be commensurate with the metaphor of "a man's home is his prison," with the quantum leap of transposing inmates' cells from a correctional facility to their homes. The net effect, therefore, would be that offenders who are serving part or all of their jail sentence at home would be afforded absolutely no fourth amendment constitutional protection from having their homes or their persons searched without a search warrant.

Alexander M. Esteves, Note, <u>Changing of the Guard: The Future of Confinement Alternatives in Massachusetts</u>, 17 New Eng. J. on Crim. & Civ. Confinement 133, 167 (1991) (footnote omitted).

At the time of the search, appellant had no reasonable expectation of privacy in the home, which was serving as his jail cell.[5]  Therefore, the search of appellant's home carried with it no Fourth Amendment implications, and the trial judge did not err in denying the motion to suppress.  In light of this conclusion, we need not consider whether appellant voluntarily consented to the search.

<u>Disclosure of Barnick's Psychiatric Records</u>

The trial court entered a pretrial order requiring the Commonwealth to provide appellant with exculpatory evidence.[6]

---

[5] There exist varying degrees of restraint of freedom on an individual who has been convicted of a crime, "ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service."  <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 874 (1987) (upholding Wisconsin administrative regulation allowing probation officers to search probationers' homes without warrant as long as probation officer obtains supervisor's approval and has "reasonable grounds" for believing contraband is on premises).  Persons whose sentences are suspended or who are on probation enjoy less freedom than those who have not been convicted of committing a crime.  <u>See</u>, <u>e.g.</u>, <u>Anderson v. Commonwealth</u>, 25 Va. App. 565, 490 S.E.2d 274 (1997) (upholding validity of one-year waiver of Fourth Amendment rights as condition of suspended sentence), <u>aff'd</u> <u>en</u> <u>banc</u>, 26 Va. App. 535, 495 S.E.2d 547, <u>aff'd</u>, 256 Va. 580, 507 S.E.2d 339 (1998).  By analogy, a person under home incarceration enjoys less rights than those no longer serving a sentence of incarceration.

[6] The order required the Commonwealth to provide the defense with "any statements which the Commonwealth alleges were made by the accused which relate to the charges pending before this

After trial, appellant filed a request for a subpoena duces tecum to obtain from Woodburn the records of Barnick's psychiatric treatment, as well as information regarding medications prescribed for her through the facility for the preceding ten years.  Appellant contended, as he does on appeal, that the requested information should have been revealed by the Commonwealth before trial and that he was entitled to use the information to demonstrate that Barnick had committed perjury at trial.  The trial court granted a motion to quash the subpoena duces tecum.  Appellant subsequently filed a motion to vacate his conviction based upon the Commonwealth's failure to disclose Barnick's psychiatric records.  The trial court denied this motion also.

We first address the aspect of appellant's argument pertaining to the Commonwealth's failure to provide the defense with Barnick's psychiatric records prior to trial.  It is unquestioned that "[t]he Commonwealth is required to provide a defendant exculpatory evidence, including evidence which impeaches the credibility of a prosecution witness."  Goins v.

Court; any scientific tests and/or reports in the possession, custody or control of the Commonwealth which relate to the offense pending before this Court whether inculpatory or exculpatory; and any and all such other discoverable evidence required by Rule 3A:11 of the Rules of the Supreme Court of Virginia, as well as, exculpatory evidence indicating lack of guilt or mitigating degree of culpability and relating to questions of punishment[,] as well as evidence or leads to evidence on these matters including that which could be of use

Commonwealth, 251 Va. 442, 456, 470 S.E.2d 114, 124 (1996).  In

fulfilling this disclosure obligation, the "prosecutor has a

duty to learn of any favorable evidence known to the others

acting on the government's behalf in the case, including the

police."  Kyles v. Whitley, 514 U.S. 419, 437 (1995).  See also

Williams v. Commonwealth, 16 Va. App. 928, 932, 434 S.E.2d 343,

346 (1993) ("[o]ne accused of a criminal offense may obtain

exculpatory evidence known to the prosecution").  Moreover,

> [i]n order for a defendant to establish a
> Brady [v. Maryland, 373 U.S. 83 (1963),]
> violation, he must demonstrate that the
> undisclosed evidence was exculpatory and
> material either to the issue of guilt or to
> the issue of punishment.  The mere
> possibility that "undisclosed information
> might have helped the defense, or might have
> affected the outcome of the trial, does not
> establish 'materiality' in the
> constitutional sense."

Goins, 251 Va. at 456, 470 S.E.2d at 124 (citations omitted).

We find nothing in the record to suggest that the

Commonwealth or its agents had pretrial knowledge that Barnick

had received psychiatric treatment.  Indeed, defense counsel

first broached the subject of Woodburn in cross-examination of

Barnick.  The Commonwealth could not have been expected to

produce records of which none of its agents had knowledge.

Furthermore, the record does not show that Barnick's

psychiatric records would have proven that she testified

_____

to the defense in the impeachment of prosecution witnesses as
such is known or can become known to the Commonwealth . . . ."

untruthfully, that she harbored a bias against appellant, or that she possessed a motive to fabricate her testimony. Considering all of the evidence produced at trial against appellant, we cannot say the results of the trial would have been different had the Commonwealth provided appellant with Barnick's psychiatric records.

To obtain information through a subpoena duces tecum, appellant was required to show that the requested documents were "material to the proceedings."  Rule 3A:12(b).  A "trial court's refusal to issue a subpoena duces tecum . . . is not reversible error absent a showing of prejudice."  Gibbs v. Commonwealth, 16 Va. App. 697, 701, 432 S.E.2d 514, 516 (1993).

When appellant filed his subpoena duces tecum request, all that remained was for the trial court to sentence appellant. Barnick's credibility was no longer at issue.  Thus, Barnick's psychiatric records were not material to the proceedings then pending in the trial court.  Moreover, because the records would not have produced a different outcome at trial, as noted above, appellant has demonstrated no prejudice from the denial of his request for a subpoena duces tecum.  Accordingly, we find no reversible error in the trial court's decision.

Finally, we must determine whether Barnick's psychiatric records qualified as after-discovered evidence necessitating a new trial.

"Motions for new trials based on after-discovered evidence are addressed to the sound discretion of the trial judge, are not looked upon with favor, are considered with special care and caution, and are awarded with great reluctance. . . . The applicant bears the burden to establish that the evidence (1) appears to have been discovered subsequent to trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial."

Hopkins v. Commonwealth, 20 Va. App. 242, 249, 456 S.E.2d 147, 150 (1995) (en banc) (citation omitted).

Appellant has failed to prove that Barnick's psychiatric records satisfy three of the four prongs of this test. Barnick was appellant's former girlfriend, and she had met with defense counsel in preparation for trial. In fact, it was defense counsel who first mentioned the subject at trial, questioning Barnick specifically about Woodburn. The trial court found that Barnick was subpoenaed as a witness for the Commonwealth prior to trial. Therefore, appellant should have anticipated her appearance as a witness.

Considering these facts and circumstances, Barnick's prior treatment at Woodburn does not appear to have been discovered after trial. In any event, however, the exercise of reasonable diligence by appellant would have revealed this information. As earlier noted, earlier access to Barnick's records would not

have produced an opposite result at another trial.  Accordingly, the trial court did not err in refusing to set aside the verdict on the basis of after-discovered evidence.

For the foregoing reasons, we affirm appellant's conviction.

<u>Affirmed.</u>

Benton, J., dissenting.

## I.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend IV.  In applying this amendment, the United States Supreme Court has drawn a firm line around houses and recognized as "a 'basic principle of Fourth Amendment law[,]' that searches and seizures inside a home without a warrant are presumptively unreasonable."  Welsh v. Wisconsin, 466 U.S. 740, 748-49 (1984) (citations and footnote omitted).

> The Fourth Amendment protects the individual's privacy in a variety of settings.  In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home - a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated."

Payton v. New York, 445 U.S. 573, 589-90 (1980) (citation omitted).  "In a long line of cases, [the] Court has stressed that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well delineated exceptions.'"  Thompson v. Louisiana, 469 U.S. 17, 19-20 (1984) (citation omitted).

The burden is on the Commonwealth to establish an exception to the warrant requirement.  See United States v. Jeffers, 342 U.S. 48, 51 (1951); Walls v. Commonwealth, 2 Va. App. 639, 645, 347 S.E.2d 175, 178 (1986).  Moreover, in discharging its obligation to prove one of the specific, well delineated exceptions, the Commonwealth "bear[s] a heavy burden."  Welsh, 466 U.S. at 749-50.  In my judgment, on this record, the Commonwealth failed to meet its "heavy burden."

(A)

When the search occurred, Michael Megel had been convicted by a judge of the general district court and ordered to serve six months at home under the Fairfax County Community Corrections Program.  Code § 53.1-131.2(A) provides that the judge may "assign the offender to a home/electronic incarceration program as a condition of probation."  (Emphasis added).  The written agreement that Megel signed when he entered the program included a provision that the "Sheriff's Office staff will conduct home visits."  Megel signed no other document giving the Sheriff's office staff or any other agent of the Commonwealth the right to search his residence.  In addition, nothing in the rules and conditions of the program that Megel signed purported to be a waiver of Megel's Fourth Amendment rights.

Based upon its assertion that Megel's home was a "home jail cell," the Commonwealth argues on brief "that society would not

accept as reasonable any expectation of privacy [Megel might assert] from home searches by the sheriff."  In support of that argument, the Commonwealth cites Anderson v. Commonwealth, 256 Va. 580, 585-86, 507 S.E.2d 339, 341-42 (1998), and asserts that "[b]ecause a court can reasonably condition probation on a waiver of Fourth Amendment rights, a fortiori a jailor can reasonably condition home incarceration on such a waiver as well."  The rules and conditions of the program, however, did not condition entry into the program on Megel's waiver of his Fourth Amendment rights.  Thus, Anderson, which is premised upon the existence of a "waiver . . . requiring [the accused] to submit his person and property to search and seizure at any time by any law enforcement officer with or without a warrant," 256 Va. at 586, 507 S.E.2d at 342, has no bearing on the resolution of this case.

The classic description of an effective waiver of a constitutional right is the "'intentional relinquishment or abandonment of a known right or privilege.'"  College Savings Bank v. Fla. Expense Bd., 119 S. Ct. 2219, 2229 (1999) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).  Moreover, the following principles are well established:

> Courts indulge every reasonable presumption against a waiver of fundamental constitutional rights.  The burden rests upon the party relying on a waiver to prove the essentials of such waiver by clear, precise and unequivocal evidence.  The evidence must not leave the matter to mere

> inference or conjecture but must be certain
> in every particular.

White v. Commonwealth, 214 Va. 559, 560, 203 S.E.2d 443, 444 (1974) (citation omitted).

The document Megel signed contains no language that reasonably can be construed as either a consent to a search or seizure of his property or a waiver of his Fourth Amendment rights. "In Virginia, one does not relinquish constitutional rights by mere silence; there must be an affirmative act." Pittman v. Commonwealth, 10 Va. App. 693, 695, 395 S.E.2d 473, 474 (1990). Indeed, the trial judge made no finding that the rules and conditions or any other document Megel signed contained a waiver. Contrary to well established principles, the Commonwealth would have us presume a waiver. I reject that invitation.

The rules and conditions Megel signed state simply that the "Sheriff's Office staff will conduct home visits." No reasonable interpretation of that proviso gives rise to a waiver of Megel's Fourth Amendment rights. Even if that proviso is construed to permit the Sheriff's staff to "look around" to ensure their safety, well established rules delimit the scope of that type of activity.

> [A] protective sweep of a building without a
> warrant may be justified by exigent
> circumstances if the officers reasonably
> believe that there might be other persons on
> the premises who could pose a danger to
> them. . . . However, to excuse this

> departure from the usual requirement of a
> warrant, the executing officers must be able
> to "point to specific and articulable facts"
> supporting their belief that other dangerous
> persons may be in the building or elsewhere
> on the premises.

United States v. Whitten, 706 F.2d 1000, 1014 (9th Cir. 1983)

(citation omitted).  Furthermore, the Supreme Court has limited

the degree of the intrusion.

> We should emphasize that . . . a protective
> sweep, aimed at protecting the . . .
> officers, if justified by the circumstances,
> is nevertheless not a full search of the
> premises, but may extend only to a cursory
> inspection of those spaces where a person
> may be found.  The sweep lasts no longer
> than is necessary to dispel the reasonable
> suspicion of danger.

Maryland v. Buie, 494 U.S. 325, 335-36 (1990) (footnote

omitted); see also Arizona v. Hicks, 480 U.S. 321, 325 (1987)

(noting that the officers "taking action, unrelated to the

objectives of the authorized intrusion, which exposed to view

concealed portions of the apartment or its contents, did produce

a new invasion of respondent's privacy unjustified by the

exigent circumstance that validated the entry").  Thus, even if

the Sheriff's staff could "look around" under the guise of a

protective sweep, that interpretation of the agreement Megel

signed did not constitute a waiver of Megel's Fourth Amendment

rights against a search of his home.

The majority holds, instead, that Megel's "home is the functional equivalent of his jail or prison cell."  In my judgment, neither the circumstances of home detention nor the law governing Fourth Amendment expectations of privacy support the majority's analysis.  That Megel was subject to the rules of the Community Corrections Program and could be returned to jail if he violated those rules does not establish that his home was the functional equivalent of jail.  Indeed, those special rules and conditions and the threat that Megel could be returned to jail prove by their very nature that Megel's home was not functionally equivalent to jail.

Although Megel was barred from using alcohol or drugs, the rules contained few other restrictions upon his conduct at home. Megel resided at home with a female friend and his child.  He was permitted to shop for food and necessities for two hours each week, go to work, and go to church.  He could receive unlimited visitors, make an unlimited number of telephone calls, and generally conduct his life while at home without supervision or restrictions, except for the possibility of unannounced visits by the Sheriff's staff.  Given the circumstances under which Megel lawfully resided in his home, the majority's assertion that Megel's home was the functional equivalent of a jail or prison cell defies logic.

Furthermore, the institutional security concerns that are inextricably bound to the definition and identity of prison and jail are not applicable in the program. The Fourth Amendment rights of prison and jail inmates are suspended because of the need within the institutional environment "to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979). The Supreme Court has noted that, because of the peculiar exigencies of the confined prison populations, it "strike[s] the balance in favor of institutional security, which . . . is 'central to all other correction goals.'" Hudson v. Palmer, 468 U.S. 517, 527 (1984). Those security concerns, however, are not the same outside prisons and jails.

Even the Commonwealth concedes on brief that "[i]t is true that, in Hudson, . . . the Supreme Court, in holding that prisoners had no reasonable expectation of privacy in their prison cells, focused on the societal interest in institutional security." When the decision was made to allow Megel to participate in the home incarceration program, the Commonwealth dispensed "with the close and continual surveillance . . . required to ensure institutional security and internal order." Hudson, 468 U.S. at 527-28. Few, if any, of the realities of prison and jail confinement that give rise to a diminished expectation of privacy naturally exist in home detention. "It

is obvious that a jail shares none of the attributes of privacy of a home."  Lanza v. New York, 370 U.S. 139, 143 (1962).

Even if, by signing the rules and conditions governing home incarceration, Megel's reasonable expectation of privacy "would be of a diminished scope," Bell, 441 U.S. at 557, nothing in those rules and conditions can be construed to grant the government the extraordinary right to search Megel's home without a warrant.  "[C]onvicted persons do not forfeit all constitutional protections by reason of their conviction."  Id. at 545.  In short, the limitations placed on Megel's freedom of movement fail to establish that his home was the functional equivalent of a jail cell, and the Fourth Amendment jurisprudence governing expectations of privacy in jails and prisons is not implicated in home detention programs.

(C)

The Commonwealth also attempts to justify the search of Megel's apartment based on consent.  However, "'[c]onsent to a search . . . must be unequivocal, specific and intelligently given . . . and it is not lightly to be inferred.'"  Elliotte v. Commonwealth, 7 Va. App. 234, 239, 372 S.E.2d 416, 419 (1988) (citation omitted).  Whenever the Commonwealth alleges that a search was consensual, "[t]he [Commonwealth] . . . bears the burden of establishing consent and this burden is heavier where the alleged consent is based on an implication."  Walls, 2 Va. App. at 645, 347 S.E.2d at 178.  Moreover, the Commonwealth's

"burden . . . is not satisfied by showing a mere submission to a claim of lawful authority."  Florida v. Royer, 460 U.S. 491, 497 (1983); see also Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968).

The evidence proved that a deputy sheriff and two detectives went to Megel's residence.  One of the detectives testified that the following occurred when Megel opened his door:

> Deputy Kidwell told [Megel] that he was going to check the house, said that they had some information, that they wanted to look around.  I then identified myself as a police officer . . . and then I went to the back room.  It was a one bedroom apartment. I went to do a cursory check of the back bedroom and came back and then spoke to [Megel] again. . . .
>
> I told [Megel] that, basically, why we were there.  I told him I was with the narcotics section in Fairfax County Police and we received some information that he might have some drugs in the house.  Did he have anything?  And he said, no, [he] did not. And I asked him again, are you sure that there is nothing in here illegal, no drugs. He said, no, go ahead and look around.  And that is when myself and Detective Longerbeam looked around.

The trial judge found that "Megel's own testimony indicated that he believed he was required to permit the sheriff to search his home at any time the sheriff came for a home visit."  In view of Megel's testimony and that of the detective, the trial judge "conclude[d] that . . . Megel consented to the . . .

request to search, thus, obviating the need for a warrant."

That conclusion is not supported by the facts or the law.

When the officers entered Megel's apartment they did not ask his permission to search. The detective testified that the deputy sheriff "told [Megel] . . . he was going to check the house." (Emphasis added). The detective then went "into the back bedroom and [took] a quick look around the apartment, [to] make sure that it was safe . . . to be in there." The trial judge's conclusion that Megel believed the officers were permitted to search whenever they visited vitiates any claim by the Commonwealth that Megel consented. The prosecution's "burden of proving that the consent was, in fact, freely and voluntarily given . . . cannot be discharged by showing no more than acquiescence to a claim of lawful authority." Bumper, 391 U.S. at 548-49 (footnote omitted). Indeed, where as here, Megel's subjective belief was also based on the incorrect view that the officers had a right to search, the Commonwealth's difficulty is compounded.

> For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation of privacy regarding their homes, papers, and effects. Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking

> as well. In such circumstances, where an
> individual's subjective expectations had
> been "conditioned" by influences alien to
> well-recognized Fourth Amendment freedoms,
> those subjective expectations obviously
> could play no meaningful role in
> ascertaining what the scope of Fourth
> Amendment protection was. In determining
> whether a "legitimate expectation of
> privacy" existed in such cases, a normative
> inquiry would be proper.

Smith v. Maryland, 442 U.S. 735, 740-41 n.5 (1979); see also

United States v. Ladell, 127 F.3d 622, 624 (7th Cir. 1997)

(noting that one of the questions in determining the legitimacy

of consent to search is whether "the person who gave the consent

knew it could be withheld").

Clearly, the officers and Megel believed that Megel's

consent was not required for the officers to search his home

without a warrant. Megel merely acquiesced to the officers'

claim of lawful authority and did so based upon a faulty

premise. Furthermore, Megel said the detective could "look

around" only after the deputy sheriff asserted his authority to

"look around." That is not "unequivocal, specific" consent to

search. Elliotte, 7 Va. App. at 239, 372 S.E.2d at 419. No one

asked for Megel's consent to search, and he gave no consent for

a search.

Because Megel neither consented to the search nor waived

his Fourth Amendment rights, I would reverse the trial judge's

refusal to suppress the evidence that resulted from the

warrantless search of Megel's home.

> "We are not dealing with formalities.  The
> presence of a search warrant serves a high
> function.  Absent some grave emergency, the
> Fourth Amendment has interposed a magistrate
> between the citizen and the police.  This
> was done not to shield criminals nor to make
> the home a safe haven for illegal
> activities.  It was done so that an
> objective mind might weigh the need to
> invade that privacy in order to enforce the
> law. . . .  We cannot be true to that
> constitutional requirement and excuse the
> absence of a search warrant without a
> showing by those who seek exemption from the
> constitutional mandate that the exigencies
> of the situation made that course
> imperative."

Chimel v. California, 395 U.S. 752, 761 (1969) (citation omitted).

## II.

Prior to trial, Megel filed a motion for discovery of exculpatory evidence, which specifically requested "[t]he psychiatric records and/or history of all government witnesses." Although the trial judge ordered the Commonwealth to provide exculpatory evidence, the Commonwealth failed to produce the psychiatric records of its witness, Veronica Barnick.  At trial, Barnick testified and lied about her treatment in a psychiatric facility.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963).  As the Supreme Court

has emphasized, "[t]his . . . means the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." Kyles v. Whitley, 514 U.S. 419, 437 (1995). Furthermore, the Court has ruled that "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Id. at 433-34 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). Thus, "[a] 'reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Kyles, 514 U.S. at 434.

The Commonwealth relied heavily on Barnick's testimony that the guns were not hers. Her credibility was pivotal to the Commonwealth's case. The evidence proved, however, that Barnick initially told a police officer that the guns were hers. In addition, Megel produced witnesses at trial who testified they sold the guns to Barnick. The undisclosed psychiatric evidence was favorable to Megel within the Brady rule because it could have been used for impeachment purposes. See United States v. Bagley, 473 U.S. 667, 676 (1985). The failure to produce impeachment evidence that would have discredited Barnick's testimony undermines confidence in the outcome of the trial.

For these reasons, I would reverse the conviction and remand for a new trial.